California, like every other state, has broad police powers to adopt laws and regulations, design, support, and protect the arts and artists that live and operate within its borders. California, in particular, prides itself on its support for the protection of art and artists. That's why California is a center for filmmaking in the United States. It's why California is a place that so many artists make a destination, make their homes. It's also why California adopted the statute at issue here, the California Resale Royalty Act, which is modeled on the droit de suite statutes that exist in dozens of other jurisdictions around the world. There is nothing in the Copyright Act that stands in California's way or stands in the way of California's rights under the Constitution to adopt laws to protect artists and help them to thrive here. Neither Section 301A's express preemption provision nor the First Sale Doctrine creates any barriers to the statute at issue here. And I think there's an important point to make before we really get into this, and that is there is no field preemption under the Copyright Act. In order for there to be preemption, either the CRRA has to be preempted expressly under Section 301A because it provides a right equivalent to one of the Section 106 rights, or it has to conflict with the First Sale Doctrine, which are the two grounds that are being argued here, and neither of those things is true here. Section 301A is very clear and made even clearer by Section 301B. That section of the Copyright Act says that Congress only intended to preempt state laws that create rights equivalent to the rights provided in Section 106. And for purposes here, there are really only three rights that we have to talk about. There is the Section 106.1 right to reproduce. The CRRA has nothing to do with reproduction rights. There is the 106.2 right to create derivative works. The CRRA has nothing to do with the right to create derivative works. Neither defendants nor the district court said that it did. And then there is finally the right to distribute created under Section 106.3. And contrary to what the defendants have argued here and contrary to what the district court decided, the CRRA has nothing to do with the distribution right created under Section 106. My view would be that as long as California doesn't outright prohibit a particular transfer, that no matter what other burdens are imposed on that transfer, there is no conflict. I don't know that I would go that far. I don't think I need to either. How could we draw a principled line? I thought your position was that because the seller is still free to sell to whomever he or she wants to, that there can't be any. No, I think that's right. I'm sorry. Maybe I misunderstood the first thing you said. I think that's correct. But I think I would make the point a little differently. I would simply make this point, that what the CRRA provides is a right to receive payment, right? Whether it's connected with resales, original sale doesn't matter. It provides a right to receive payment. There is no right to receive payment under Section 106.3. It's just not within the scope of the distribution right. We know that for multiple reasons. First, because someone who sells a copyrighted work and wants to receive payment has to contract for the right to receive payment or has to look somewhere other than 106.3 for the right to receive payment. When they sue to enforce that right, they can't sue under 106.3. Right, but I'm just asking. So if the royalty were, you know, much higher or there were some other restriction that fell short of an outright prohibition, right? Yes. You would say that's California, go for it? Even if on the ground, in practical terms, it's going to mean far fewer transfers? I think that's probably right. I think that's a decision that California can probably make, right? And I don't think one can argue whether as a policy matter that's a good idea. But I don't think there's any argument to be made. So California had a 95 percent tax that said unless you get the permission of the artist, we're going to tax 95 percent of the subsequent proceeds. That would be okay. Well. It might be bad policy, but it would be okay. Well, I think that's not the question that we have here. I understand. I understand it's not the question. That's why I'm asking you the hypothetical. Right, right. I follow. I think so, except for one thing that you said, unless you get the permission of the artist. Because what you're saying there is essentially then the artist has the ability to dictate essentially whether or not that transaction happens. And maybe that does constitute essentially an exercise in distribution rights. Here in the CRA, the artist can't contract away from that. Isn't that correct? That's right. The artist has no ability to exercise any control whatsoever over whether the sale happens. So you're saying, but distribution really, are you saying it's only physical? Because this also takes away the artist's right. The artist can't distribute, in effect, 100% of the rights to the buyer. Isn't that correct? No, I don't think so. I think there's a couple of things to keep in mind. One is, remember, we're talking about a very small sort of subsection of artwork here. It's a handful of artists. The artist has to be sold for $1,000, has to be sold for a profit, and so on. But I'm sorry. I don't think that it's true that it takes away the artist's distribution rights. The artist still has the right to sell and transfer the artwork. The other person is the owner of the artwork. They take title to that artwork. I started out by saying, are you saying that it only refers to physical? I can hand you the painting, but I can't hand you 100% of the rights to that painting. Both at my end, I can't do it, and the buyer can't buy it. When you talk about the first sale doctrine, usually means you've exhausted your rights and it's gone. In California, under this law, you can't do that. No, I think you can, because I think the distribution right is the right to pass title. And that's what's—the artist is passing title. Title isn't— By property one, it's not 100% of the bundle of rights, right? Because you can't—you've got this 5% hang-on that you as the seller are not really selling, and you as the buyer are not really buying. So maybe if you want to tell me that distribution only means physical, that's fine, but that's kind of what I'm asking you. Isn't that the logic of your position? I think that's right. I think the distribution is the right to pass title. It's the right to pass the physical object. Because ultimately, when we're talking about the distribution right— 95-90, 85-50, I don't have to get to 95. That makes it very odd for us to be trying to make some kind of broad legal distinction. Is 5% okay, but 10% wouldn't be okay? Well, I think we have to look at the act that we're facing, which is this one, which is 5%, and that's really what ought to dictate here. And I think we would prove in the court that it doesn't operate as any sort of burden on transactions, but that ultimately is a factual issue. But I think the real point here is that the distribution right, a right to payment isn't encompassed within that, and that is all that the CRA provides. I don't understand what you just said. The right to payment is not encompassed in the right? Not encompassed in the distribution right. And we know that for several reasons. One, because if you want a right to payment, you have to look to some other body of law, often it's contract law, in order to receive payment in connection with the sale of artwork. We know it because, for example, this Court in Otto v. Rees decided that a partnership claim to receive part of the proceeds of the sale of a copyright work wasn't preempted because what we were talking about was the payment right, not the right to have a say-so over whether the sale occurred or not. We know it because this Court in Ryan v. Additions Ltd. West made clear that the right to enforce fee-shifting provisions in a contract pertaining to copyrighted works wasn't preempted because that right to receive fees, money, isn't encompassed within the distribution right or the other rights under Section 106. I think ultimately the issue is that in order to be preempted under Section 301A, the State law has to create a right that can be abridged by an act which in and of itself would infringe one of the exclusive rights listed in Section 106. That's the Harper-Roe Publishers case that's cited in Defendant's brief. And to put it simply, the CRA just doesn't provide a right that is the same as or equivalent to the distribution right or any other right under Section 106. Roberts. Can I ask you a slightly different question? Let's say that we're persuaded by your 301 argument but have concerns about conflict preemption. Your position is that that issue is basically taken off the table for our purposes by, I can't remember the name, is it Morseburg? Morseburg. Yes, but that is our position. I think Morseburg really resolved that. But we don't have to say that. I think there are – Morseburg fundamentally was right then and it's right today. And I think the Supreme Court's decision, the most recent decision in the Lexmark case, where the patent case talked about the first sale doctrine, really resolves this issue and there can't be any further question on the issue after Lexmark, because Lexmark makes clear, as have the cases before it like Kurtzsang and Quality King and this Court's decision in Verner v. Autodesk and others, it makes clear that the first sale doctrine has one purpose and one purpose only, and that is to terminate the Section 106.3 distribution right. That's what it does and that's all it does. Now, the district court and the defendants have argued, no, it does more than that. It provides a right of alienation or free alienation to the purchaser of a copyrighted work. Lexmark says that's not true, because this is what Lexmark says, and I think this is an important point to make. Lexmark says that that right, the right to sell, the right to do with what you wish, an object that you buy, is not supplied by the intellectual property laws. It's supplied by other law. Lexmark says, this is at page 1534 of Lexmark, the right to use, sell, or import an item exists independently of the Patent Act. What a patent adds and grants exclusively to the patentee is a limited right to prevent others from engaging in these practices. Exhaustion extinguishes that exclusionary power. And as we've discussed in our briefs, the patent exhaustion doctrine is identical to the Copyright Act's for sale doctrine, and Lexmark says that as well. Yeah, I think all those cases hurt your position. So let me just, and you're welcome to make another run at that. What I was going to ask is, if we thought, obviously Morseburg is not controlling in the sense that it was interpreting the 1909 Act, and it kind of set aside the prospect that maybe 301 under the 76 Act would change things. Is there some argument that maybe the addition of 301, even though the first sale doctrine hasn't changed, I mean, you stress that, I think, rightly so in your brief. But is there an argument that with the addition of 301, even though it's an express preemption provision, we're talking about conflict preemption, that that maybe has undone the conflict preemption analysis that would otherwise be controlling in Morseburg? I don't think so, and I don't see how it could. Section 301 says what section 301 says, which is these are the things that are expressly preempted, those things that provide rights equivalent to section 106. The conflict preemption argument has nothing to do with the equivalent, some equivalence between the CRA and any of the section 106 rights. That argument is entirely different. That argument is that the first sale doctrine provides some affirmative set of works, and the CRA somehow burdens or infringes upon those affirmative set of rights. And as I've indicated, I think that's wrong for two reasons. One, because Morseburg says it doesn't infringe on any, it doesn't burden any right of resale. And I think that, you're right, I think Morseburg is binding and remains binding. That decision, the analysis employed in Morseburg is binding. But I think it's also the argument the defendants in the court made about infringing some affirmative right of resale held by a purchaser of copyrighted works is wrong because the first sale doctrine simply doesn't provide that right. As Lexmark tells us, to the extent there is such a right, that exists outside of intellectual property law. It isn't something that's created by the first sale doctrine. I guess, let me just tell you why I think I, why I said earlier that I think those cases hurt your position because I guess I read them as saying that the first sale doctrine itself really does embody this common law principle that you mentioned, exhaustion in the patent context. But it's basically like when you sell the material object into which the copyrighted work is embodied, you're, that's the end of your, you know, that extinguishes your rights as the copyright holder, at least in terms of the transfer of that material object. And so it seems to me that if that principle holds, then the California law can't possibly, the California law can't sit consistently with that principle, right? I think there's an important point and perhaps refinement to what you said that needs to be made. And that is the first sale doctrine extinguishes the copyright holder's rights under the Copyright Act. That's what Kurt Seng says. It's what Quality King says. It's clearly what Lexmark says. It's what this Court said in Verner v. Autodesk and so on. It is not that the first sale doctrine is designed to or does terminate all rights that the artist might have. It terminates the rights that exist under the Copyright Act. So the, so your point then is that the, is that the buyer, the first buyer, has whatever common law rights he has to sell it. And what the CRA is simply an exception to the common law right that he would have the right to sell and capture all of the proceeds for himself. That's exactly right. And I think that's what Lexmark says in the passage that I quoted, yes. Unless you have anything more, I'd like to reserve the rest of my time. Actually, I do have a question for you, and I'll make sure that you have adequate time to argue. So if, assume for purposes of this question that I disagree with you on the 301 and that I do believe that the CRA is expressly preempted by 301, what's left of your case? What would continue to exist are claims that relate to sales that occurred prior to the enactment of 301. Okay. And so that would cover claims from what period? Prior to 1970, well, I think January 1, 1977. I don't remember exactly how far back the CRA goes, but it goes back a couple of years prior to that. If I can tell you exactly when it became effective, hang on a second. Okay. It covers pre-'77, and the CRA comes into existence in, is it 1976? So what we're really talking about is the one-year period between 1976 and 1977? Yes, that's right. It's less than that. It was enacted, I think, in September. Right. Right. It's a short period of time. Okay. And do we have any idea how many potential claims there are out there for that? No. We don't know. We don't know. So if we were to decide the 301 question against you, we might still have to reach the conflict question with respect to that very brief period. I think that's true. Between the adoption of the CRA and the enactment of the 1976, the effective date of the 1976 amendments. I think that's true, yes. Okay. All right. Okay. Thank you, Mr. Bose. May it please the Court. Deanne Maynard for Sotheby's. I'm joined by Jason Russell, who represents Christie's, and Angela Dunning, who represents eBay. I would like to say I'm going to address the issues common to all the appellees, and I would like to save three minutes for Ms. Dunning to address the eBay-specific issues, if I might. As a district court correctly held, the plaintiff's claims are preempted by the Copyright Act, and that's all this Court needs to decide to affirm. But they also fail for another reason, which is that they violate the Takings Clause. And I'd like to start with the copyright issue, if I might. The district court correctly held the claims preempted for two reasons. First, conflict, and also express preemption. Judge Bybee, just to clarify one issue, the CRA became effective January 1st, 1977, and the 1976 Copyright Act became effective January 1st, 1976. So we're really only talking January to September 1977, and what we would be looking for is anything that was sold, any artworks that were sold in that period? Or artworks that were created during that period? What are we looking for? I don't know what the plaintiff's claims are based on sales. I would assume, Your Honor, it is entirely doubtful to me that there are any that would survive the statute of limitations. But the conflict preemption, Your Honor, would resolve all the claims, as you recognize, and the district court correctly held the claims preempted as a basis of own conflict preemption grounds. The claims conflict with the choice, the balance that Congress struck between the rights of creators and the free flow of copyrighted works. Go ahead. No, I was just going to ask about Mooresburg. That's what I was going to ask about, so go ahead. Yeah, so I don't see, I mean, the conflict preemption rationale seems to me has to be taken off the table by Mooresburg, unless you say that there's something about the addition of 301 that changes that conflict preemption analysis, right? Because we went through the whole thing with the first sale doctrine and conflict preemption in Mooresburg. Well, the district court, though, correctly held that Mooresburg is no longer binding. Maybe not correctly. That is what it held, and I don't know that it had the right to do that, as a district court especially. But take my, let's say I'm troubled by that, okay? And I look at Mooresburg and I say, boy, it seems to have addressed the exact same issue because the first sale doctrine has not changed at all, correct? The Supreme Court has made clear that the reasoning in the Mooresburg decision is incorrect. It's fundamentally inconsistent with the rationale, and I would like to discuss that with Your Honor, but I understand you're asking me to accept that. Well, no, that would help if you persuade me on that. So regardless of what you think about what the district court has the authority to do, a three-judge panel of this court under the en banc decision in Miller clearly has the authority to decide that subsequent governing authority has so fundamentally eroded the reasoning and rationale of a previous decision that it's the subsequent authority that should be followed. And that standard is met here. Okay, how so? Because at the time of Mooresburg, and if you look at the rationale of Mooresburg, one, and this is where I think 301 is relevant to your question, Mooresburg thought that it was okay for states to fill in perceived gaps in the federal copyright laws, and that's incorrect, and Section 301 makes that clear. Well, no, it's not incorrect unless something is expressly preempted under 301, and that's why I was pausing the question. Let's say I'm not persuaded on express preemption, and I think it's either conflict preemption or bust for you on this. Okay, so moving on. The rationale in Mooresburg, when it looked at the first sale provision, was that technically speaking, technically speaking, that's the word that Mooresburg used, the first sale doctrine didn't conflict. The California resale loyalty obligation didn't conflict with the first sale doctrine, and the Supreme Court has since made clear in decision significantly reversing this circuit. So in quality terms. Is there a minus of that? Why does that have to be your question? Well, it's relevant to the decision that faces you, Your Honor, because the question is whether the rationale and reasoning of Mooresburg has been, is clearly reconcilable with subsequent precedent, and the decisions in Quality King and later in Kertzeg make clear that at the time of Mooresburg, this circuit took too narrow a view of the first sale doctrine, an incorrect view. Mooresburg was wrong when it was decided, and that's been made clear by subsequent precedent. What's made it clear? So in Quality King, the Supreme Court said that the Ninth Circuit was giving too cramped a view to the first sale doctrine. The details matter here, counsel. Yes, Your Honor. So what did the Court say in Quality King that undermines Mooresburg? I understand that in Quality King there was a 1996 Ninth Circuit opinion that was part of the background for all of this, and they disagreed with us on that. I got that part. Right. What has it said about the – what did Quality King say about the first sale doctrine that undermines our reasoning or view in Mooresburg? But can I take – I'm going to take – I grant Your Honor that the holdings in Quality King and Kertzeg are different than the question facing you today, but the rationale undermines the rationale in Mooresburg in this way, which is the Supreme Court made clear in those two decisions that the statutory provision, statutory first sale provision, must be interpreted broadly and must be interpreted in light of the common law doctrine from which it flows, which is the restraints against alienation. And that the principle of the first sale doctrine is that once an owner sells a particular item into the stream of commerce, that creator's rights as the creator are exhausted, and that purchaser and any subsequent purchasers are free to sell that item free and clear of any obligations or strings to the creator. And that is what Quality King – that's the rationale of Quality King. That's clearly the rationale of Kertzeg. And then in Impression Products' last term, the Supreme Court reiterated that and made really crystal clear this point, which is that an intellectual property owner, whether it be patent or copyright, must take all the reward, all the financial reward they want for their act of creation from the first sale, and they are entitled to but one reward. And that's been the law since, as we cite Keillor in our brief, that's been the law back long before Mooresburg. But these intervening authorities make clear that Mooresburg was wrong in thinking that a resale royalty was not the kind of restraint that the first sale doctrine prohibited. Okay, so can – I think I read the cases the same way you did on that front, but let me ask you this. Let's just change the nature of the act before us slightly and convert it to more of a classic tax. So you wouldn't have any problem with California enacting a 5% sales tax, let's say, on the sale of fine arts, the kind of art that's covered by this act, right? Well, a tax would present fundamentally different questions, but this is another subsequent authority that's relevant to the Miller v. Gamme analysis, which is the en banc court. I'm sorry? The en banc court in this very case. So the court sat en banc earlier in this case, and it rejected the tax analogy. I know, I know. I was just trying to create a hypothetical. I wasn't talking about this case. Yes, I'm sorry. I was just trying to – can you just play this out? Yes. Can I finish what I was going to ask you? Please. I just want to find out how far this goes. So let's say that California enacted a 5% sales tax. There's no issue with conflict or express preemption under the Copyright Act, right? Probably not. Okay. Even if the state were to basically segregate those funds and distribute them to the artists itself in the same way that this act works, is that still okay? The state may be able to do it. If it's a valid tax that has all the indicia of a tax, the state may be able to do it. Okay. Even if it's earmarking the funds it collects, this 5% sales tax, and it goes out and identifies the artists themselves and gives them the 5%, so as long as the state is just a conduit basically for doing more indirectly what's being directly done here, that would be okay? They may be able to do that. Okay. So that's what I guess I'm trying to figure out. Your problem – or not your problem, but the Copyright Act's problem, I suppose, with California's act is that the money has to be paid directly to the artist. That's what causes all the problems under the Copyright Act? The problem with what California has done is that they've effectively placed a tag on each sale of art, and they've given a right to the creator, directly to the creator. So this isn't a tax. This is cause of action given to the creator because he is the creator of the art. But that's what I'm asking. So that's the problem is that the money – because in my hypothetical, the exact same thing is happening, and the exact same tag is being placed on every single artwork that's sold in California. It's just being done indirectly. And you say that that might not be – that's a problem. That's okay. I don't want to concede away a future case if they pass that, but the Supreme Court's made clear that how governments do things matter, and what they've done here is not that. This is not a sales tax. In fact, the California government appeared in the en banc court at oral argument and disclaimed this was a tax, and the en banc court held it's not a tax, as Your Honor knows. So this isn't that hypothetical. But the problem with this is, just like in impression products, what California has done is imbued in the creator the right as the creator to apply against the world, all strangers, this 5% gross royalties and the other burdens that come along with it that they've attached to the item, and it's going to flow in the stream of commerce. And that's exactly what the first sale doctrine privets. So Bob's Merrill makes this clear. Bob's Merrill is a case where the owner of the copyright put a label in the front of the book saying, be noticed, everyone, don't sell it for less than a dollar. And you could still sell it to whomever you wanted. You could still sell it whenever you wanted. But if you sold it for less than a dollar, then they would sue you purportedly for copyright infringement. And that was what preempted. What California has done is effectively that. They've put a tag on the back of every painting, on the back of every sculpture, and they've said, Dear Future Owner, you must find and pay the artist 5% of the gross proceeds if you resell this. Or they can sue you. And certainly finding an artist and not being sued is more than just writing a check to the IRS. Whatever may be the flaws of the sales tax, it's very different than this. And this is exactly what the first sale doctrine prohibits. And it's clear that the creator couldn't do that, put a label on the back, nor can California do it by legislative fiat. And Morseburg believed that it would want and another reason why Morseburg's rationale has been undermined, which is Morseburg conceded that this statute would probably affect sales, would probably cause some sales to be so unprofitable that they wouldn't occur. But it did not think that was relevant to the conflict preemption analysis. Kertzeg makes clear it is highly relevant. Kertzeg has a whole passage where it goes through the kinds of practical problems that the position that wouldn't have exhausted there would cause museums and booksellers. And it makes clear that those are the kinds of, it's not a factual question, as counsel said, it's a legislative question, as the kind of courts look at all the time in doing statutory interpretation. And so Kertzeg makes clear that that part of Morseburg is not right, it's mistaken. And so under this court's decision in Miller v. Gammey, this panel is free, and I think the district court was free as well. It's not so much declaring Morseburg overruled as it is a choice between which law to follow, and this court is supposed to follow, as I think the district court was, to follow the subsequent authority that is now the governing law. And so we think the district court did correctly hold these claims all barred by conflict preemption. I also think that the district court was right to find them expressly preempted. Even the 1977 claims? The one year. No, I don't think the one year before the enactment. In order to get rid of all of this, we would have to reach the conflict question. Either that or agree with us on our takings argument. Okay. On the takings argument, I don't think I've ever seen, I guess I'm not thinking, I can't think of a case in which a law was unconstitutional because it constituted a taking. Takings is a remedy. It allows, it requires the state to pay just compensation. I'm not aware that it gets treated sort of like substantive due process and that we can hold laws unconstitutional under the takings clause. Well, it's being raised here as a defense to a claim against the defendants. And so it's not dissimilar from the situation in Horn where the government imposed a penalty on the Horns for not complying with the Agricultural Marketing Act, and they raised as a defense that it was a taking, that the raisin program was a taking. And this is the same. This is effectively the same. And the law is unconstitutional if it's a taking? Well, the taking is unconstitutional. The claims here are The taking is unconstitutional unless the government pays just compensation. That would be the remedy here. It's not that the law is unconstitutional. It's that the government can't take the property and not pay you money. That would be unconstitutional. But the remedy is to order the payment of money. But the compensation would just be you send them $5,000 and then they pay just compensation by sending it back. Exactly, Judge Boggs. And so when the Supreme Court has made clear, Your Honor, that taking of money can be an unconstitutional taking. And so in a situation where you're just talking about dollar for dollar, then it's not that we're here seeking compensation. If you declare the taking unconstitutional, then you don't have the taking, then you don't need the compensation. But, one, the Supreme Court, as the district court recognized money, the taking of money can be an unconstitutional taking. And here it is for two independent reasons. One, the law places the law requires the payment of money as a condition for exercising property rights. If you're going to sell your property lawfully, you must pay 5% of the gross proceeds to the seller. And that, under the Coons case, makes clear that that kind of burden on the exercise of the rights of a specific piece of property, and here we would be talking about in each instance a specific piece of property, a particular painting or sculpture that's being sold, it's placing a burden on the seller's right to sell a 5% gross proceeds. And that's a per se taking under Coons. And it violates. I was actually going to ask you to speak for a minute about the express preemption argument you alluded to. Yes. Yes, Your Honor. So the claims here are also expressly preempted. Section 301 expressly preempts claims that are equivalent to the Copyright Act. There's no dispute here that these are within the subject matter of copyright, so we're only talking about the equivalents. And the essence of the claims under both the Copyright Act, Section 1063, the right to distribute for sale, and the CRRA, the California Resale Royalty Act, is the receipt of money for the distribution of artwork. And also, the conduct that creates liability under the California Act is conduct covered by the Copyright Act, the distribution of artwork. So these are equivalent rights, and there is no qualitative difference. I mean, I could understand, I suppose, if some of the proposals had been enacted that, you know, established as part of the Copyright Act payment of a resale royalty. Obviously, if there had been something like that, then what the CRRA was trying to do would be equivalent. But there's nothing even close to equivalent in the Copyright Act as it now stands. Well, with respect, Your Honor, that's not the question. So the fact that the rights aren't identical doesn't mean that the rights in the CRRA are somehow transformed into a different right than a copyright right. It's still a copyright-like right. It adheres to the creator as the creator. It applies against strangers. It applies to everyone. It lasts for life plus 20 years. And its only difference, the only difference they point to as potentially meaningfully different, is the fact that it's a 5 percent royalty, it's a set royalty rate, as opposed to one that you would negotiate given your right under 106.3. Congress could have passed a specific royalty amount, and it didn't. But that doesn't mean that California is not passing a copyright-like right that's equivalent to the rights of Copyright Act. The fact that Congress didn't choose to provide that means of payment doesn't mean it's a qualitatively different right. I just don't see how it's not equivalent to the distribution right because there is no restraint on the distribution. It may be an encumbrance upon that, and maybe that's why it creates conflict preemption issues with respect to the first sale doctrine. But it's not in any way equivalent to the right to distribution because that right is not what the CRRA speaks to. That's why I guess I just don't understand how you can think that it's within 301. One of the things that the courts have looked at, Your Honor, to see whether or not the rights are the same, is whether the liability created. So here the liability is created by distributing the work of art. That's what triggers the liability. That's the complaint that the artist brings is that you distributed my work of art without paying me. That is the right that's in 106.3, and that the exclusive right to distribute the works for payment, for sale. Can we conceptualize it? Maybe this isn't right, but can we conceptualize it as the Copyright Act establishes rights to distribute 100% of something, and the California law now establishes rights to distribute 95% of something. And I think Your Honor's way of phrasing it actually proves, I think that proves. Because to me as an outsider in the sense to these high-powered IP arguments, is same or equivalent is very odd because it's clearly not identical. So how do you get close enough? And so that was the way I was conceptualizing it, as being somewhat equivalent. I think the way you're phrasing it is a good example of why it is the same right. If the scope is different, Your Honor, and the Second Circuit holds this in Harper, if the scope is different, if that's all you're talking about, that doesn't make it a not qualitative, that doesn't make it qualitatively different. And Judge Boggs's point that, you know, the 1063 right is 100% right to distribute. The California resale royalty right comes in and actually makes a non-waivable right that you can't distribute 100% of it. You have to distribute it with this tag on it that whoever resells it is going to have to track down the artist and pay the artist 5% of the gross proceeds. That's fundamentally the same right. The liability is caused by acts that are covered by the Copyright Act. I've run into Ms. Dunning. I'm going to allow Ms. Dunning her time, so I don't think there's any concern there. Are there further questions? Judge Bobby, did I fully answer your questions about the takings? Maybe. Yeah. I mean, if I could just have, the second reason why it's a taking is this is a specifically identifiable property. I understand that if we were to say that this is a taking by California, that California would obviously choose not to do the step transaction of saying, that's great, give us the money, and then we'll just turn right around and give it back to you. I understand that sort of effectively, but there is a difference between a takings clause as a remedy and a takings clause as a form of substantive due process that tells us the laws are unconstitutional. That was the point that I was concerned with. Let's hear from Ms. Dunning. Thank you, Your Honor. Thank you, Ms. Maynard. Thank you, Your Honors. May it please the Court, Angela Dunning on behalf of eBay. I have three brief points to make on eBay's behalf, and I appreciate the time, because eBay is somewhat differently situated here. My first point is simply that the CRRA imposes a royalty payment obligation solely on the seller or the seller's agent. That seems simple because it comes straight out of the language of the statute. 986A says that the seller or the seller's agent shall pay the artist, and 986A1 says the agent shall withhold 5% of the amount of the sale, locate the artist, and pay the artist. Plaintiffs have argued in this case that it's not necessary to show agency in order to impose a royalty, and that simply conflicts with the plain language of the statute. The second point I want to make is that the district court properly held that eBay operates neither as a seller nor as an agent for those who sell goods on its platform. I'm not going to spend much time on the seller point. Plaintiffs essentially concede that here, and every court to consider the issue has held that eBay is not a seller. But eBay is also not an agent for those who sell goods on its website. As is by now fairly common knowledge, eBay is a platform that lets sellers and buyers come together to negotiate transactions. It's not involved in those transactions, as its website and user agreement make very clear, and plaintiffs have never come forward with facts that might allow them to overcome the presumption under California law that eBay acts for itself and not as an agent. But such a finding would actually be wholly inconsistent with how eBay operates. For instance, plaintiffs do not allege here any facts that would show that eBay somehow manifested an agreement or consent to serve as an agent for its sellers. To the contrary, its user agreement says exactly the opposite. It disclaims agency. No agency relationship is intended or created by this agreement. Plaintiffs also cannot show that the sellers control eBay's operations or have the right to do so. To the contrary, eBay dictates the terms of use of its website by buyers and sellers alike. So for this reason, the Attorney General of California has specifically concluded that eBay does not act as an agent for its buyers or sellers, and Judge Reinhart reached that same conclusion in the en banc proceedings. Can I ask you, is there some value to your client in getting a ruling from us on this point wholly apart from, let's say that we were otherwise going to rule as the district court did, for example? Sure. Well, I guess I'd answer that twofold, Your Honor. First of all, we, of course, join all of the arguments offered by Ms. Maynard and believe that the copyright preemption and takings arguments dispose of the whole case. But if this court is inclined to send any portion of it back, we certainly don't want to continue to be dragged along in this case. It's been seven years, and plaintiffs have never come forward with any facts that might show agency. It would be absolutely futile to allow them an opportunity. No, no, I'm not talking about this case. I don't know why you're here, frankly, because it seems like you should have been out a long time ago. But I'm saying if you were to otherwise win on the merits, let's say, is there some value because of the kind of litigation your client continues to face with respect to other statutes that you want a ruling on this? Well, I guess I would say yes, Your Honor. The fact that eBay has – I mean, we have cited numerous decisions to the court in which parties have claimed over and over again that eBay is a seller or an agent, and the courts have consistently struck that down, and it's burdensome and expensive to continue to litigate baseless claims like that. So, yes, there is value in getting a ruling that eBay is not an agent for its sellers that would somehow put that to rest and allow eBay to go on with its business. But that's also required here on the facts of the case, and we've been dragged along, and so we're seeking affirmance on that basis. I guess I wanted to just conclude with why leave to amend would be futile. I just want to point the court specifically to footnote 16 in Plaintiff's reply brief. Their opening brief didn't mention the ruling that eBay isn't bound by the statute at all. They relegate that to the reply brief, and specifically in footnote 16, plaintiffs claim that if they were given leave to amend, they would add certain facts that were enumerated in their opposition to eBay's motion to dismiss, and that is at pages 294 to 295 of the eBay record. Those pages, in turn, cite only to certain provisions of the eBay user agreement, which are fundamentally inconsistent with agency. They don't support it. They actually substantially undermine it. Just to give one example, plaintiffs point to a provision in which eBay informs its users, and this is page 357 of the record, the user agreement provision. This provision says that in the case of a dispute between buyers and sellers, eBay may choose to reimburse the buyer its payment and then seek reimbursement from the seller in that case. And this shows not only that eBay controls its own operations and dictates the terms of use, but that it's looking out for buyer protection. It doesn't remotely suggest that eBay is functioning as an agent or fiduciary on behalf of sellers. But this is the best plaintiffs have been able to come up with, even though eBay's user agreement has been online consistently throughout the case, its operations are open and notorious. Thank you again for allowing me the time. eBay does urge affirmance on the grounds that Ms. Maynard advanced, but also on this additional ground that's unique to eBay, that the statute simply doesn't apply to it. Thank you, Your Honor. Roberts. Thank you, Ms. Dunning. Mr. Bose. Thank you. I'll just briefly touch on the eBay issue and the takings clause issue, and then I want to go back to the preemption issues. I think the fundamental issue with eBay's arguments here is, first, the district court gave us leave to amend, to allege facts that would demonstrate that eBay is an agent, and to argue that the California Attorney General... And what would those facts be? What would those facts be? Yeah, what would you allege? For example, that eBay takes possession of the money that is paid in connection with these sales and distributes it and takes possession of it on behalf of the seller and gives it to the seller. It would be, for example, that eBay has the right and the ability and does in fact take control of these transactions, for example, when there are disputes between the parties. It would be, for example, that eBay is receiving bids. And I think that... Let me take a second to talk about this. One can't separate eBay from its computer systems. eBay can't hide behind the fact, well, we don't have a live auctioneer who stands up in front of a bunch of people and takes bids to say it isn't an agent, it doesn't act as an auctioneer, which is an agent. eBay does that. It just does it electronically, and there's no difference. It is still eBay that is doing that. There is no distinction between eBay and an ordinary auction house in that sense. It's just that eBay does it electronically over the Internet rather than live and in person in a room in San Francisco or New York. I think the other point to be made there is that we think that the CRRA makes an auctioneer an agent for purposes of that statute because of the way the statute is drafted. It says when a piece of artwork is sold at an auction or by a broker or so on or so on or by someone else acting as an agent, thereby implying that someone operating an auction for purposes of that statute is an agent for purposes of that statute. You have to look behind what is the purpose of the statute, which is the person conducting the sale who receives the money, which eBay does, we would allege, has the ability to and the obligation, therefore, to withhold that 5% fine of the artist and pay the artist. Ultimately, this issue about whether eBay is an agent is a fact issue. You just can't decide that on the pleadings alone, particularly when there's been no discovery and no, so far, no amendment to the original complaint. On the takings clause issue, I think there are just two very basic points to make. In addition to the point you made, Judge Vibey, that is, first, these defendants don't have standing to raise this issue. Even if there were a property-righted issue here, it's not their property that we're talking about and, therefore, they don't have standing to raise it. I think the other point to be made is the law is very clear. This court in United States v. Lawson said that auction proceeds are not property. There cannot be a taking of something unless the thing that's being taken is property. United States v. Lawson says, no, after an auction is conducted, the auctioneer merely owes a debt to the seller and that isn't property within the state property law or within the takings clause. Getting back to the preemption issues, I think there's a fundamental point that we need to focus on with respect to express preemption, and that is this. No one here, or at least on this side of the bench, seems to dispute that an artist could contract for the right to receive a 5% royalty in connection with the resale. O'Connor. That's completely private. That's very different from the State ordering something. But the point is, that is true, it is different, but it doesn't matter that it's different because that argument, this argument that, well, it's different because it's not a private agreement between the parties, assumes that there's some contract exception to preemption, that it's the existence of a contract that would make that not preempted. And it's not. It's not true. That's not the way that express preemption works. It isn't the case. We know that there's no contract exception because this Court has said so. It's said so in Laws v. Sony Music. This Court says that. And the contract argument, well, it didn't fly at all with me. You can argue to my colleagues, but this one just didn't. That dog didn't hunt. Well, I think the point is that the reason that there can be, by contract, a payment obligation, or by statute, or by common law, for example, a fiduciary obligation to make a payment obligation, is that this payment obligation doesn't exist within Section 106.3. That is what is the determining factor as to whether or not there is preemption. Does the right that is being enforced by State law, whether it be by contract, whether it be by partnership law, whether it be fiduciary due to law, or in our case, the CRA, does the right that's being enforced, is it one that's equivalent to the distribution right in Section 106.3? The distribution right simply does not include a payment right. It cannot be equivalent to the Section 106.3 distribution right if that right doesn't include the right that we're talking about. It's not the same. And that's ultimately what this Court says when it talks about contracts, when it says, well, these contracts would be preempted or would have to be enforced by a copyright claim because they're just rights that are provided by Section 106. And these contracts can be enforced separately under contract law because they provide rights that are not the same as Section 106 rights. It's the point that determines whether or not something is preempted is, is the right that we're talking about one that is supplied in Section 106? The right to payment is not supplied in Section 106, and therefore it is not preempted. The analysis is as simple as that. With respect to the First Sale Doctrine, I think, again, we sort of need to back up here for a second, and that is this concept of restraints on alienation and its relationship to the First Sale Doctrine. There is a fundamental misunderstanding at this table and there's a fundamental misunderstanding in district court of how those two things relate. And Lexmark really tells us how they relate. It very clearly tells us how they relate. There is a common law right to, to freely alienate property. It exists within common law. When the Supreme Court in Bobbs-Merrill incorporated the First Sale Doctrine or that concept into the Copyright Act, what it said is, and what the Supreme Court most recently said in Lexmark is, this common law right exists to free alienation. The Copyright Act, and in particular the distribution right, operates as a restraint on free alienation. The First Sale Doctrine terminates the restraint created by the Copyright Act, thereby essentially restoring the common law rights of free alienation. The First Sale Doctrine does not create some set of rights to resell. What it does is it terminates the Copyright Act's restraint on the right to resell. And that is all that it does. That's what Lexmark says. It's what Kurtzsang says. It's what Quality King says. It is fundamentally incorrect to characterize the First Sale Doctrine as providing some right to resell free of restraints. It's just not what that doctrine does. It's not what Section 109 says. It's not how it operates. It simply eliminates a restraint created by the Copyright Act, and that's as far as it goes. Roberts. Thank you. I thank counsel for the argument. It's a very interesting case. It was well braved. We thank you for your argument. The Court is in recess.
judges: Boggs, Bybee, Watford